24139.  MONROE *v.* THE STATE.

DECIDED DECEMBER 18, 1934.

*Branch & Howard, Eugene L. Tiller,* for plaintiff in error.

*John A. Boykin, solicitor-general, J. W. LeCraw, E. A. Stephens,* contra.

MacINTYRE, J.  The indictment in this case charges that on July 17, 1933, in Fulton county, Georgia, Mrs. Peggie Lee Monroe, alias Peg Monroe, "did . . kill and murder one Jack M. Cason, by then and there shooting him with a pistol." Having been convicted of voluntary manslaughter, the defendant filed her motion for a new trial.

At the trial the State introduced several witnesses, together with other evidence, but the defendant offered no testimony and relied upon her statement to the jury.  The defendant contends that there was no voluntary manslaughter in the case.

We shall not attempt to give a detailed statement of the testimony of the nine witnesses who testified for the State, but the following is a fair statement of the main features of the case.  Jack M. Cason was shot and killed at about eight o'clock on the night of July 17, 1933, in his room (number 928) in an Atlanta Hotel. Cason was married, but his wife was not living with him in Atlanta at the time of the homicide.  The defendant was also married, and resided with her husband in Augusta.  The defendant came to said hotel on the afternoon of July 15, 1933, and was promptly conducted to Cason's room, without being required to register.  The room was locked, but a bell boy unlocked the door with a pass-key, and admitted the defendant.  Her baggage consisted of a "hat-

box" such as ladies sometimes use for a valise. From the time of her arrival at the hotel on Saturday until the homicide on the following Monday night, the defendant appears to have remained closely in Cason's room.

Vain Bradley, a bell-boy, carried ice water to room 928 the day before the tragedy, and Cason and a woman were in the room. On Monday morning Cason requested the bell-boy to bring a bag down. After asking the lady if she was ready, Cason told the boy to take the bag down and have a cab waiting, as he wanted to catch the nine o'clock train. Shortly after the boy carried the bag down, Cason ordered him to carry it back, as "they were not going," but were going to wait for the next train. The boy carried the bag back to the room, and the lady asked him where Cason was, and the boy replied that he went down the street. The woman in the room was the same one who was there when the boy carried the ice water there Sunday morning.

Shortly before eight o'clock on the night of the homicide, Earl Veal, a private waiter, had a call to Cason's room. Cason read the menu, took the woman on his lap, and asked what she would have. She replied, "chicken," and Cason said "duplicate the order and rush it." Cason ordered the waiter to come and get the dishes at half past eight o'clock. Witness saw a bottle of whisky on the table in the room. The woman pointed out to the witness in the courtroom looked like the woman who was in the room. Cason did not appear to be drunk. Cason was "playing with the woman."

When Otis Bradley, a bell-boy, answered a call to room 928, Cason told him to "take the lady's baggage downstairs," and order a cab to come to the side door. This was shortly before the homicide. Witness "set the bag down right at the side door, and told one of the boys to watch it" while he got the cab. Witness "got the cab . . and got the bag and put the bag inside the cab and waited." After waiting three or four minutes, witness left the cab, because Cason had told him "they would be right down," and "the lady was dressed and ready to go," and Cason was in the act of putting on his coat and hat. Just as witness looked through the door, he saw Mr. Rushin, the house detective, run towards the elevator, and, because this was unusual, witness went in the hotel. On reaching the lobby he heard some one say that "a person had been shot on the ninth floor." Witness then

went back to the cab and told the driver that he would be back as soon as he could find out "what was detaining the man." Witness left the baggage in the cab and started up to the ninth floor to see what he could find out. When he got as far as the eighth floor the elevator girl told him that Cason had been shot, and witness immediately went back down and got the bag and carried it "right upstairs to the manager's office and locked the bag in that room," which was room 210. This was done at the suggestion of the house detective. What witness referred to as a "bag" was a "hat-box." The witness identified the defendant as the woman he saw in Cason's room.

The elevator girl testified that she had a ring for the ninth floor, and that when she opened the door she heard somebody groan, and saw Cason leaning "against the elevator shaft on the left" of the elevator. Cason had on his hat. He said, "I am shot," and sank to the floor. The girl immediately called Mr. Rushin, the "house officer" at the hotel. Mr. Rushin went up and spoke to Cason, but Cason made no reply. Rushin and a bell-boy carried Cason to his room, but found the door fastened on the inside. Rushin locked the door with his pass-key from the outside and carried Cason in another room—number 931. Rushin immediately called a doctor, who said Cason was dead. The elevator was several steps from Cason's room. After communicating with the coroner, Rushin opened Cason's room with a screwdriver, and he and Mr. Armstrong, a detective, entered the room. The defendant was lying lengthwise on the bed, fully dressed, with the exception of hat and shoes, which were on the floor beside the bed. "She had a gun in her hand, pressed sorter up, held with both hands," and Armstrong twisted it out of her hands. To the best recollection of witness, the pistol was "a Smith 38," and it resembled the one exhibited to him. The pistol had some thirty-eight cartridges in it. When the pistol was wrested from the defendant, she said: "It didn't work, did it?" Defendant never got off the bed, and witness "pulled her around with her feet on the floor and put her shoes on her." She left witness under the impression that she was drunk. When she was taken to the police car she "could not walk unassisted, and . . could not get in the car unassisted. The room was not in disorder. Witness saw in room 210 "a hat-box apparently made of leather or some stiff stuff, . . a suit-

case made in the shape of a hat-box." Mr. Armstrong testified that he took "four loaded shells and two empties" out of the pistol which the defendant had. He found in the defendant's purse a return ticket to Augusta, stamped "July 15, 1933." He also found in defendant's hat-box three other cartridges "of the same calibre." Witness also found in the hat-box in room 210 a special-delivery letter, addressed to a woman at Columbus, Georgia, signed "Jack," and dated July 14. Witness found a quart bottle with just a little whisky in it on the dresser in room 928. After the inquest, when defendant was asked why she killed "Jack," she replied: "Why, I did not know Jack was dead . . Where is he at? Carry me to him."

At this stage of the case, the State introduced in evidence said special-delivery letter signed "Jack." In reference to this letter, a special investigator testified: "Mrs. Monroe mentioned that letter to me herself . . She said: 'I played a trick on Jack. He gave me a special-delivery letter to mail, and instead of mailing it I put it in my box.' The first time I saw that letter it was in the file for the trial. . . The letter, together with other evidence, was placed there by Mr. Pounds and Mr. Cole in our office. The envelope is in the same condition now that it was when we first got it. I do not know what condition it was in when it came out of Mrs. Monroe's box, where she said she had played a trick on Jack. I did not take it out of the box." The witness had already testified that the envelope in which the letter was found had been torn open at the end.

There was testimony that long previous to the homicide the defendant and Cason had been conducting themselves improperly in Greenville, South Carolina. Mrs. Cason testified that on one occasion she caught them practically nude in a room together, and that the defendant cursed her vilely and pulled Cason towards the bed. There was testimony that on several occasions the defendant abused and threatened to kill Mrs. Cason, and that she had also made threats against Cason. There was evidence from which the jury had the right to conclude that the pistol with which Cason was shot was one which the defendant had long previous to the time of the shooting. Charles Stewart testified that he heard detective Davis ask the defendant, the morning after the homicide, "What did you have last night?" and that the defendant replied

that they had a party up there, but that she had "passed out" and did not know what time the party was.

In her statement to the jury the defendant said in substance that she had not seen Cason since April, 1932, and that he had completely gone out of her life; that it was not until the early part of "last year" when Cason appeared at the hotel in Augusta where she and her husband lived happily, and told her that he had found out that Mr. Monroe was out on his run as an engineer; that Cason wanted to talk to her, and she told him that she had already suffered enough humiliation and sorrow on account of their past relations, and that any attempt on his part to renew their past associations would result in serious trouble to him or her husband, as her husband had said that "if this man ever pursued his former course, he would kill him;" that instead of taking her at her word, Cason began writing to her, telling her in one of his letters to come to Atlanta; that she did not reply to these letters, and that on Thursday before the homicide, Cason wrote her a letter wherein he stated that he was coming to Augusta and find out why she refused to come to Atlanta; that she knew her husband would be home Sunday, and, feeling that there would be serious trouble if Cason came to Augusta, she decided to "catch a midday Georgia railway train and come to Atlanta and return to Augusta, leaving Atlanta at nine o'clock p. m.," and "prevent this man from coming to Augusta;" that on arriving in Atlanta she called up Cason on the telephone and told him that she wanted to talk to him about a matter of importance, and he suggested that she come to the hotel; that she went to the hotel and was sent up to a room which she did not know was Cason's room until he came in later; that she was lying across the bed with her clothes on, because she was sick, and when Cason came in she told him so, and asked him to raise a window, because she thought she would faint; that then Cason produced a drink of whisky, and she told him that she was afraid to take it, as she was returning on the nine o'clock train that night; that Cason insisted that the whisky would do her good, and in her weakened condition she "foolishly took it;" that she urged Cason not to come to Augusta, and he said he had to go to the store a little while and would be back; that Cason shortly returned with a married couple, and that they took a drink and soon left; that the next thing she knew it was seven o'clock the next morning,

when she woke up with all her clothes on just as she was when she first got on the bed upon her arrival; that she was not herself twelve hours after taking the drink Cason had given her, and that she thought the whisky given her had some kind of an opiate in it; that she was too sick to go home, and stayed in bed all day Sunday; that some man and his wife called Sunday night, and they all had a drink, but that she was too sick to know much about what was going on; that she was still sick Monday morning, but decided to go home then if possible; that after she had sent her baggage down stairs she had another serious attack and was unable to leave; that she then decided she would leave Monday night, thinking that she had convinced Cason that they could not resume their "former relations;" that Cason seemed reconciled to her decision to leave, and asked her to have a drink, which she refused; that when she started to leave Cason said: "You are not going to Augusta tonight;" that she tried to reason with him, and finally told him that she was going whether he wanted her to or not; that Cason then said that she was not going back to Augusta that night—that he "would kill both of us;" that she picked up the telephone receiver to call for help, and Cason jerked it out of her hand and began choking her; that they had a violent struggle, in the course of which he struck her several times; that she was still struggling to get loose when Cason secured a pistol from the closet shelf, and stood with his back against the door, and said he would kill her before he would let her go; that she "grabbed the pistol," and in the scuffle it went off; that by this time Cason seemed to have lost all control of himself; that she had hold of the pistol with both hands, and "finally jerked it out of his hand;" that she stepped back, and he cursed her and rushed forward, saying he would kill her; that, knowing he would kill her if he again got the pistol, she shot him one time as he advanced on her; that Cason then turned, unlocked the door, and started out in the corridor; that she did not know how seriously he was hurt, but, knowing that whether he lived or died, there was nothing ahead of her but humiliation and sorrow, she locked the door and hurriedly wrote a note to her husband, knowing that the note would be found after her death; that she became afraid and "took a big drink of whisky from a bottle that was in the room;" that her mind was hazy as to what happened then, but that she remembered pulling the trigger and trying

to shoot herself when the officers came in; that the officers took her to the police station, but that by that time she was half crazy and knew very little of what happened; and that she never spoke to Mrs. Cason in her life.

The note written by the defendant to her husband after the shooting, was in evidence, and was as follows: "Daddy: I've did what I long to do. It was coming to him. He caused too much suffer already. Believe it or not, but my love is for you. But I have been treated wrong. Pinkie." There was other evidence, but, for the purposes of this decision, we deem it unnecessary to go into it.

It was for the jury to determine whether the defendant shot in defense of her life, or whether she killed Cason because of a "sudden, violent impulse of passion supposed to be irresistible," engendered by the fact that in endeavoring to prevent the defendant leaving the room, Cason struck and choked her. We hold that the evidence supports the verdict of voluntary manslaughter, and that there is no merit in the general grounds of the motion for a new trial. In this connection see the similar case of *French* v. *State*, 43 *Ga. App.* 97 (5, 6) (157 S. E. 902).

Special ground 1 avers that the court erred in admitting in evidence the special-delivery letter found opened in defendant's hat-box after the killing. This letter was addressed to another woman, was couched in very endearing terms, and strongly indicated that Cason had been intimate with the woman to whom it was written. This letter was objected to upon the ground that "it was written to a woman not a party to the case on trial; that there was no evidence showing that the defendant had read the letter or knew its contents, and that in the absence of such evidence as to knowledge of its contents on the part of the defendant, the letter was irrelevant and of no probative value. The defendant stated in substance that Cason gave her the letter to mail, and that she "played a trick on him" by putting it in her hat-box instead of mailing it. This hat-box was put in the manager's room for safekeeping very shortly after the homicide, and when the hat-box was opened soon after the killing, the letter was found in it opened. There is no evidence to show that the hat-box had been opened prior to that time, or that it had been tampered with prior to the time it was introduced in evidence. The letter was addressed to

another married woman and was a special delivery letter, and it appears that the defendant was sufficiently interested in it to keep it out of the mail and secrete it in her hat-box. Who opened it? We think that under all the facts and circumstances of the case, the only reasonable inference is that the defendant did, and also that she read it. We think that the letter was admissible to show motive, under section 1023 of the Penal Code (1910). Furthermore, this letter would appear to illustrate motive for murder, rather than for the offense of voluntary manslaughter of which the defendant was convicted, and we doubt if the admission of the letter in evidence would be ground for a new trial in any event.

The second special ground avers that the court erred in charging the jury the law of voluntary manslaughter, the contention being that this law was not involved in the case. For reasons set out in our discussion of the general grounds, there is no merit in this assignment. Neither was it error, as averred in this ground, for the court to recall the jury, on their request, and charge again the law of voluntary manslaughter.

Judgment affirmed. Broyles, C. J., and Guerry, J., concur.